UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
────────────────────────────

PATRICIA M. COZAN PIERCE,

              Plaintiff,        **No. 6:12-CV-6191(MAT)**

      -vs-                   **DECISION AND ORDER**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.
────────────────────────────

## I.   Introduction

Represented by counsel, Patricia M. Cozan-Pierce ("Plaintiff"), brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c).

Presently before the Court is Defendant's motion pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 12(c) for judgment on the pleadings, which Plaintiff has opposed. Because the ALJ made a significant error of fact in making the severity determination at step two, his decision denying benefits is not supported by substantial evidence. As discussed further below, Defendant's motion for judgment on the pleadings is denied, and the matter is remanded for further administrative proceedings.

## II. Procedural History

On December 15, 2008, Plaintiff protectively filed an application for Title II benefits, alleging disability commencing January 1, 2002, due to carpal tunnel syndrome ("CTS"), colitis, and arthritic pain. After the claim was denied on March 27, 2009, Plaintiff requested a hearing, which was held on June 24, 2010, before Administrative Law Judge James E. Dombeck ("the ALJ"). The ALJ was unable to find 12 months of continuous disability from March 4, 2009, back to May 29, 2002, the time-frame covered by the treatment record of Plaintiff's primary care physicians. Accordingly, the ALJ entered a finding of not disabled on August 19, 2010. (T.5-14).[1] The Appeals Council declined Plaintiff's request for review on February 14, 2012, making the ALJ's decision the final decision of the Commissioner. (T.1-4).

## III. The Administrative Record

### A. Plaintiff's Testimony

Plaintiff testified that she had worked for the Center for Disability from October 2007, to May 2008. Her client was a 200-pound paralyzed man. (T.23). She ensured that he had meals and a clean place to live in her home, and her children assisted with his personal care. (T.23-24). She also drove the client to his doctor's appointments.(T.23).

---

[1]
Numbers in parentheses preceded by "T." refer to pages from the transcript of the administrative record.

Prior to that, she had worked at Kodak as a buyer, but she left in 1995. According to Plaintiff, she had taken time off work because of her medical conditions, and when she returned, they had given her buyer position to someone else. Kodak attempted to find something else for her (e.g., assembly-line work), but there were no positions that met her physical restrictions (no lifting, pushing, pulling, carrying, or handling anything over ten pounds, and nor repetitive tasks with her hands). (T.25).

After leaving Kodak in 1995, she did odd jobs, including working as a buyer at a different company, off and on, until 1999. Plaintiff indicated that she would have continued to work as a buyer at Kodak if the position had been available. (T.27).

Plaintiff explained that after 1995, her health began deteriorating, especially her back. (T.28). She testified she had at least two surgeries on her hands, in 1993 and 2009. (T.29, 30). Plaintiff stated that she could not work after 2001 because she could not even hold a coffee cup for any length of time without losing her grip on it. (T.29). She also testified that she could not drive for long periods or her hands would hurt and swell. (T.29).

Due to a lack of insurance coverage, Plaintiff had only intermittent medical treatment between 2001 and 2007. (T.30–31). Plaintiff testified that she had seen her primary care doctors (Dr. Richard and eventually his replacement Dr. Steele) at least every other month between 2001 and 2007 (T.31). When questioned by

the ALJ about a statement that Dr. Steele purportedly had made in a March 4, 2009 treatment note, to the effect that Plaintiff was returning after not having been seen for seven years, Plaintiff stated that it was a "mega error."[2] (T. 33-34, 487). She testified that the longest that she had gone without treatment was a year, due to a lapse in insurance coverage, but that she did not believe it was even that long (T.34).

Plaintiff testified that she suffered from colitis; osteoporosis; and arthritis in her neck, shoulder, hands, back, and left leg (T.36). She stated she could not work because she could not do anything repetitive with her hands. (T.36). Since her onset of colitis sometime in 2003, she testified that she has been prevented her from completing daily activities because she does not know when she will have to use the bathroom. (T.39). Plaintiff testified that her colitis was somewhat stable with medication, but that she had taken the medication for only a month. (T.39).

Plaintiff testified that she could not perform normal tasks of daily life because of her medical conditions. (T.40). For instance, she had to get somebody to lift heavy things such as laundry detergent, or to reach anything that was above a certain level on the shelf. (T.40). She required assistance with shopping because she could not push clothes on a rack or carry bags. (T.40). She

---

[2]

In fact, the ALJ erred because the note in question was written by Dr. Mitten, a hand surgeon. Dr. Steele only was copied on the note. (T.368).

also stated that she could not drive for more than 30 minutes. (T.41).

Plaintiff's husband, son, or daughter did the cooking because she dropped the pans and utensils. (T.41). She could usually take care of her personal hygiene unless her back was bothering her, and generally needed help with personal care (e.g., shampooing her hair) about three to four days a week. (T.42). Plaintiff also testified that she did not go on walks or take walks with her dogs, because if she fell, she would not be able to get up without assistance. She did play with the dogs a little bit in her yard. (T.42).

Plaintiff testified that her hand was healing and improved after surgery in March 2009. (T.43). The doctors wanted her to continue physical therapy, but she was unable to do so because she did not have sufficient health insurance. (T.44-45). Plaintiff testified she attended two months or less of physical therapy after the hand surgery because she did not have health insurance. (T.45). She also stated that she never regained total use of her hand after surgery and was unable to hold a pound of weight over a long period of time. (T.44). Plaintiff stated that she had not had any recent treatment other than pain medications for her back, neck, and shoulder. (T.45). Plaintiff also testified that she had had ulcers since she was 25-years-old, but was not being treated for them at the time of the hearing. (T.46).

**B.   Medical Evidence**

**1.   1990 to the Onset Date (January 1, 2002)**

Plaintiff received treatment for arthritis in her neck, shoulders, back, and hands from at least May 1990, to September 2001. (T.249-84). During this time period, her pain-management consisted of Tylenol #3 (Tylenol with codeine), Naprosyn, and Flexeril. (T.249). On September 14, 2001, her primary care physician, Dr. Eric Richard, noted that apart from her arthritis, she is "feeling fine." (T.249). He observed that Tylenol #3 "help[ed] her function." (T.249). Plaintiff was directed to return in a few months for follow-up.

**2.   The Period Relevant to a Finding of Disability (January 1, 2002, to March 31, 2007)**

**a.   2002**

On January 4, 2002, Plaintiff returned to Dr. Richard complaining of increasing arthritis pain as well as skin lesions on her chin, neck, and left shoulder. (T.245). Physical examination revealed full range of motion, with no tenderness, swelling, or erythema in her joints. (Id.). Dr. Richard ordered blood work and x-rays to rule out rheumatoid arthritis and systemic lupus erythematosus ("SLE"). (Id.). An x-ray of both hands, ordered by Dr. Richard, showed no bony erosions, but did show small soft tissue calcifications adjacent to the right and left ulnar styloid process which could represent residual prior trauma. (T.246, 468).

On January 22, 2002, Plaintiff had a dual-energy x-ray absorptiometry ("DEXA") test, which showed osteopenia in the right hip. (T.240-41, 473). The bone density of Plaintiff's spine and left hip were normal (T.21, 474).

Plaintiff saw Dr. Richard on February 26, 2002, complaining of pain in her stomach. (T.237, repeated at T.238, 396). Dr. Richard diagnosed possible peptic ulcer disease with some dyspepsia, osteopenia, and bilateral hand arthritis. (T.237).

On April 27, 2002, Plaintiff returned to Dr. Richard, with complaints of pain in her hands and depression. (T.235). Plaintiff's joints were somewhat swollen, and she had mildly decreased range of motion. (T.235). Dr. Richard diagnosed arthritis and gave her samples of Vioxx for her pain. (T.235).

On May 15, 2002, Plaintiff was referred to Dr. Berchman Vaz, in the Rheumatology Clinic of the University of Rochester Medical Center, due to ongoing pain in her hands. (T.464). Radiographic studies were negative for erosions on her hands, although she had strongly positive results for Tinel and Phalen signs on the right hand and was moderately positive on the left. (T.464). Plaintiff showed pain with movement of the right shoulder and on palpation of the back, especially the lower back. (T.464). Dr. Vaz diagnosed her with chronic pain syndrome involving the back, shoulder, and wrist, and also indicated that Plaintiff probably had CTS. In Dr. Vaz's opinion, she had oseteoarthritis, rather than inflammatory arthritis, in her hands. (T.465). At Dr. Vaz's recommendation, a

nerve conduction study was performed on May 29, 2002, which revealed mild to moderately severe CTS. (T.461–62).

### b.   2003

On March 23, 2003, Plaintiff presented to her primary care physician, Dr. Richard, with bilateral ear pain and tinnitus. (T.393). Dr. Richard noted that Plaintiff had continuing peptic ulcer disease with dyspepsia every time she discontinued Prevacid. He stated that her arthritis "appear[ed] stable" on Tylenol #3 and Flexeril, and recommended follow-up in a few months. (T.393).

A repeat DEXA scan on September 5, 2003, again showed osteopenia. (T.457).

On February 23, 2003, Plaintiff had a digestive disease consultation at Strong Memorial Hospital, and was diagnosed with ischemic colitis and intermittent diarrhea. (T.408).

On October 7, 2003, Plaintiff presented at the Strong Memorial Hospital emergency department with gastrointestinal bleeding. (T.342–57). A colonoscopy performed by Dr. Asad Ullah and Dr. Seth Wheeler on October 8, 2003, confirmed the diagnosis of ischemic colitis. (T.441). Plaintiff was discharged on October 11, 2003. (T.439–40, 442).

On October 13, 2003, during a follow-up examination, Dr. Richard noted Plaintiff had not had further bloody bowel movements and was not in acute distress. (T.392). Physical examination findings were normal except for some abdominal tenderness. (T.392).

On November 24, 2003, Plaintiff had a follow-up visit with gastroenterologist Dr. Ullah. (T.436-37). She had lost weight, and Dr. Ullah was unsure of the cause. On December 5, 2003, Plaintiff underwent an upper endoscopy to determine the cause of her abdominal pain and significant weight loss, but the test was inconclusive. (T.438). On December 11, 2003, Dr. Ullah attempted to perform another colonoscopy, but was unable to do so because of a poorly prepped colon. (T.435). However, Plaintiff's visualized rectosigmoid mucosa was normal. (T.435).

### c.   2004

On November 29, 2004, Plaintiff saw Dr. Richard and complained of epigastric discomfort. (T.389). Dr. Richard diagnosed gastroesophageal reflux disease ("GERD") with likely esophageal spasm, for which he prescribed Prevacid. Plaintiff was to continue on Tylenol #3 for her arthritis pain. (Id.).

### d.   2005

On December 14, 2005, Plaintiff saw her new PCP, Dr. Brian Steele, who had taken over from Dr. Richard. (T.387). Dr. Steele noted that Plaintiff had a mild upper respiratory infection; idiopathic thrombocytopenic purpura ("ITP") secondary to Bactrim; as well as neck, shoulder and hand pain. (T.387). Plaintiff reported no increase in her arthritis symptoms. Dr. Steele encouraged her to limit the intake of the Tylenol #3 and start using glucosamine and chondroitin to help with her arthritis. Plaintiff's physical examination was unremarkable. (T.387).

### e.    2006

On May 8, 2006, Plaintiff underwent a repeat DEXA scan, which showed normal bone density with an improvement in density compared to the 2003 examination. (T.445–46).

### 3.    Medical Evidence After Relevant Period

#### a.    2007

On December 6, 2007, Plaintiff presented to Dr. Steele to have a form completed for work. Dr. Steele examined Plaintiff and found that she was healthy and in no acute distress. (T.340). Her physical examination was normal except for deep tendon reflexes, which were 2+/4. (T.340). Straight-leg-raising was full without crossover tenderness, and there were no focal motor or sensory deficits. Plaintiff had full range of motion in her lumbar spine.

Dr. Steele recommended that she follow-up for complete physical at her convenience, as she was without insurance at that time. (T.340). Plaintiff stated she would inform Dr. Steele once she had insurance so that they could further discuss her general health maintenance recommendations. (T.340).

#### b.    2008

There do not appear to be any records or treatment notes from 2008 in the administrative record. However, gastroenterologist Dr. Ullah stated in an April 27, 2009 note that Plaintiff had an episode of rectal bleeding a year previously, for which she was treated successfully with antibiotics. (T.492).

### c. 2009

Plaintiff saw Dr. Steele on January 27, 2009, complaining of arthritis pain in her neck, shoulders, hands, and left leg with locking of her left third and fourth fingers. (T.382). She was not presently having any gastrointestinal symptoms. Upon examination, Dr. Steele found no edema in her extremities, and intact deep tendon reflexes. (T.383). She had "slight prominence" in her interphalangeal joints but no joint erythema, and no ulnar deviation of her metacarpal joints. (T.383). In her shoulders she had a slightly decreased range of motion but no crepitance (crackling). In her knees she had light crepitance with range of motion but no effusion or popliteal fullness (fullness behind the knee). (T.383).

Due to the "severity of her ongoing symptoms[,]" Dr. Steele was considering a rheumatologic evaluation to determine if she had inflammatory arthritis and to discuss other treatment options since she had "been refractory to anti-inflammatories with considerable disability and inability to work due to her symptoms." (T.383).

Dr. Steele referred Plaintiff to have x-rays taken of her hands, wrists, and shoulders on January 30, 2009. (T.421-22). On February 10, 2009, Plaintiff had an appointment with radiologist Peter Rosella, M.D. of the University of Rochester Medical Center's Olsan Group to review her x-ray results. (T.373). Dr. Rosella noted that Plaintiff had been having polyarthralgia and right shoulder pain at the acromovicular joint, as well as decreased range of

motion and pain in her left hip. Dr. Rosella's impressions of the radiographic studies were mild bilateral periarticular osteopenia in her hands; and mild degenerative changes at both basal joints, and both first metacarpal phalangeal joints. He found mild degenerative changes at the left scaphoid/trapezoid/trapezium joint. (T.374). With regard to her wrists, Dr. Rosella saw ossific denisties at the distal tip of the ulnar styloid in both wrists, likely related to a prior, remote trauma. With regard to her hips, Dr. Rosella's impression was oseteopenia with mild degeneratve changes in the left hip. (T.374).

On February 23, 2009, Plaintiff saw Dr. Ullah at the Olsan Medical Group, for gastrointestinal issues. She had last been seen in 2003, when she underwent a colonoscopy and was diagnosed with ischemic colitis. (T.371). She stated that for the past one and one-half to two years she had been having irregular bowel movements (constipation for four to five days followed by two days of diarrhea). (T.371). Dr. Ullah prescribed a regimen of Metamucil and scheduled a colonoscopy to rule out the possibility of ischemic colitis or another pathology. (T.372).

Plaintiff saw hand specialist David Mitten, M.D. at the Olsan Medical Group on March 4, 2009, with new complaints of pain around the base of both thumbs and multiple locking trigger digits. (T.368). Dr. Mitten indicated that Plaintiff had last been seen at his practice seven years ago when she presented with CTS. (T.368). Plaintiff's worst symptoms at the present time were locking and

pain in the left long, right, and small fingers. She was experiencing significant pain and having difficulty even manually extending her fingers. (T.368). This had been occurring over the past three to four months, without any detectable precipitating event. In addition to the locking trigger digits, Plaintiff also had early bilateral basal joint arthritis. Because steroid injections had not helped in the past, Plaintiff elected to undergo surgical release of her trigger digits and to continue to monitor her basal joint symptoms. (T.369).

Based upon a referral from Dr. Steele, Plaintiff saw Allen Anandarajah, M.D. at the Rheumatology Clinic at the URMC on March 9, 2009. (T.365-67). Dr. Anandarajah noted that over the past 20 years, Plaintiff had seen multiple physicians, including spine specialists and hand surgeons, for her pain in the small joints of her hands and in her back; and had had multiple hand surgeries, with no relief. (T.365). Because she "had no insurance, . . . [she] had not been following up with her physicians for a period of approximately 2 years." (T.365). Plaintiff informed Dr. Anandarajah that she only could tolerate Tylenol #3 for pain relief.

Dr. Anandarajah concluded that Plaintiff's history and examination findings were consistent with a diagnosis of osteoarthritis at multiple sites. The detection of mild Heberden's nodes and the x-ray findings suggested she had "nodal/possible inflammatory osteoarthritis" in her hands. (T.366). Plaintiff's long-standing history of back pain was in keeping with

degenerative joint disease, which commonly afflicts patients with nodal osteoarthritis. (T.366). Although Plaintiff had a positive ANA (antinuclear antibodies) level, Dr. Anandarajah ruled out SLE because she had no clinical features to support such a diagnosis. (T.367). Dr Anandarajah suggested that she try Aleve or Advil, as well as physical therapy, aquatic therapy, and acupuncture. (T.367).

Dr. Mitten, the hand surgeon, performed trigger release surgery on Plaintiff's left long, ring, and small fingers on March 23, 2009. Plaintiff did well post-operatively. (T.483-89).

On April 27, 2009, at a follow-up with gastroenterologist Dr. Ullah, Plaintiff noted she was experiencing chronic constipation, and that previously recommended treatments (Colace and Metamucil) did not work or were not palatable. (T.492). Dr. Ulla recommended increasing dietary fiber and fluid intake, and to continue taking Ex-Lax as needed. (T.493).

### d. 2010

Dr. Steele completed a Crohn's & Colitis Residual Functional Capacity Questionnaire on July 2, 2010, in support of Plaintiff's application for DIB. (T.514-18). Dr. Steele noted that Plaintiff's diagnoses were ischemic colitis, gastritis, arthritis, and ITP, and described her prognosis as "fair". (T.514). Her symptoms were chronic intermittent diarrhea, peripheral arthritis, malaise, fatigue, and mucous in her stool. Asked to describe Plaintiff's pain, Dr. Steel indicated that she had sharp abdominal pain which

was unpredictable but occasionally associated with diet, and 6-10/10 in severity; "sharp" hand pain which manifested as "stiffness" and "tingling" on a daily basis with activity, 6-9/10 in severity; shoulder pain that was similar to her hand pain; and neck pain which was "sharp" and "daily" with activity, 7-8/10. (T.514).

Dr. Steele opined that Plaintiff was "[i]ncapable of even 'low stress' jobs" because of her "pain & functional impairment." (T.515). He estimated that she could walk half a block without resting; could sit 20 minutes at a time before needing to get up; could stand 30 minutes at a time before needing to get up; and could sit and stand/walk for a total of about two hours in an eight-hour working day with normal breaks. (T.515). Plaintiff needed a job that permitted shifting positions at will and had ready access to a restroom. (T.516). Plaintiff would "frequently" need to take unscheduled breaks on an "unpredictable" basis. (T.516). Restroom breaks, "depending on severity of release & intensity of symptoms" could last from "5 min [to] hours." She had no advance notice of when she would need a restroom break. Dr. Steele opined that Plaintiff would need to lie down and rest one to two times per day for about 15 minutes. (T.516).

With regard to her abilities to lift, Plaintiff could not lift 10 pounds or anything heavier, and could only "[r]arely" lift less than 10 pounds. She could only "[r]arely" twist and could "[n]ever" stoop, bend, crouch, or climb ladders and stairs. (T.516).

Dr. Steele stated that Plaintiff's orthopedic symptoms were "daily & [increased] by activity"; her gastrointestinal symptoms were "daily w/occasional severe exacerbation brought on by stress, diet, activities & unpredictable [sic]." (T.517).

Plaintiff's medications were listed as Tylenol #3 and cyclobenzaprine (an anti-anxiety medication), which caused "fatigue/drowsiness". (T.517). Dr. Steele opined that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations he described in the report. Dr. Steele noted that on a scale from "never" to "constantly", Plaintiff's pain and other symptoms were "frequently" severe enough to interfere with attention and concentration. (T.517). Her impairments were likely to produce good days and bad days, and she would be absent due to her ailments about four days per month. (T.518).

The ALJ held the record open until July 16, 2010, to allow Plaintiff to submit additional medical evidence. Plaintiff submitted one record–Exhibit 24F, the Crohn's & Colitis Residual Functional Capacity Questionnaire dated July 2, 2010 (T.368), completed by Dr. Steele, her primary care physician. (T.13).

## V.   Determining Disability and the Five-Step Sequential Evaluation

A claimant is disabled under the Act when unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A). The impairment must be of "such severity" that the claimant is "not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work [that] exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration ("SSA") has promulgated a five-step sequential analysis: "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (citing 20 C.F.R. § 404.1520(b)-(f); § 404.1520, Part 404, Subpt. P, App. 2). During this five-step process, the Commissioner must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits." Burgin v. Astrue, 348 F. App'x 646, 647 (2d Cir. 2009) (citing 20 C.F.R. § 404.1523) (internal citations omitted and alteration in original)).

## VI. The ALJ's Decision

The ALJ determined that Plaintiff last met the insured status requirements of the Act on March 31, 2007, and did not engage in

substantial gainful activity during the period from her alleged onset date of January 1, 2002, through her date last insured of March 31, 2007. (T.10).

Through the date last insured, the ALJ found, Plaintiff had the following medically determinable impairments: CTS, ischemic colitis, and arthritic pain. (T.10). The ALJ determined, however, that Plaintiff's impairments, either singly or in combination, did not significantly limit her ability to perform basic work-related activities for 12 consecutive months. (T.10-11). Therefore, the ALJ was unable to find that she had a "severe" impairment or combination of impairments as defined in 20 C.F.R. § 1521 et seq. (T.11). In other words, the ALJ's decision essentially stopped at step two of the sequential evaluation.

The ALJ based his severity finding on his rejection of Plaintiff's subjective complaints, which in turn was premised solely upon what he perceived to be a seven-year gap in her medical treatment. The ALJ incorrectly noted[3] that "[t]he treatment notes of Brian Steele, D.O., indicate that on March 4, 2009, the claimant was seen after not having been seen for *seven years* (Ex. 17F, p. 10)." (T.13; emphasis in original). The ALJ also pointed out that Plaintiff's counsel's chronological summary of her medical history indicates a gap in treatment of about five years between

---

[3]

Plaintiff's counsel never noticed this clear error by the ALJ. Defendant's counsel likewise has never alerted the Commissioner or this the Court to the ALJ's mistake.

-18-

December 14, 2005, when she was treated by her primary care physician for symptoms of pneumonia, and January 31, 2009, when she underwent magnetic resonance imaging at a radiologist's office.[4] (T.13). According to the ALJ, "[t]here is no evidence [of] any disability symptoms or opinion of disability during the interim period, or any ongoing treatment until the beginning of 2009." (T.13).

Because Plaintiff's attorney did not notice the ALJ's mistake at the hearing or on appeal, Plaintiff testified that Dr. Steele had made a mistake and stated that the longest she may have been without treatment was "maybe a year". (T.13). The ALJ did not credit her testimony and found that what he perceived to be unexplained gaps in treatment significantly undermined her allegations of debilitating symptoms. (T.12-13). The ALJ accordingly found that Plaintiff was not under a disability, as defined in the Act, at any time from January 1, 2002, through March 31, 2007.

## VII. General Legal Principles

The Commissioner's decision that a claimant is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); see also, e.g., Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). "Where the Commissioner's decision rests on adequate

---

[4]
It is unclear to the Court how this alleged five-year gap establishes the existence of a seven-year gap.

findings supported by evidence having rational probative force, [the district court] will not substitute [its] judgment for that of the Commissioner." <u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002).

This deferential standard is not applied to the Commissioner's conclusions of law, however. <u>Townley v. Heckler</u>, 748 F.2d 109, 112 (2d Cir. 1984). This Court must independently determine whether the Commissioner's decision applied the correct legal standards in determining that the claimant was not disabled. "Failure to apply the correct legal standards is grounds for reversal." <u>Townley</u>, 748 F.2d at 112. Therefore, this Court firsts reviews whether the applicable legal standards were correctly applied, and, if so, then considers the substantiality of the evidence. <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987).

## VIII. Discussion

Plaintiff's counsel, in a sparse brief that cites only one case, mentions four grounds for remand. The Court considers these contentions in turn below.

### A. Failure to Make a Finding as to Whether Plaintiff Had a Disability Arising After the Date Last Insured

Plaintiff asserts that the ALJ did not make a finding as to whether she had a disability that arose *after* March 31, 2007, the date last insured. Plaintiff's counsel did not raise this particular argument at the administrative level. In his brief to the Appeals Council, he asserted that 2005 "could plausibly be an

amended onset date since she would have then been characterized at [sic] advanced age." (T.512). However, 2005 was during the relevant period, not after the date last insured. Although it appears that the Second Circuit has not yet ruled on this precise issue, several district courts in this Circuit have held that "[t]he failure to present an argument to the ALJ constitutes waiver of the right to raise it on appeal." Carvey v. Astrue, No. 06-CV-0737 (NAM/DEP), 2009 WL 3199215, at *15 (N.D.N.Y. Sept. 30, 2009) (citing, inter alia, Union Tank Car Co., Inc. v. Occupational Safety and Health Admin., 192 F.3d 701, 707 (7th Cir. 1999)); see also Mills v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001) (rejecting claimant's attempt to raise an issue on appeal that had not been raised at the hearing before the ALJ because to allow the issue to be raised "could . . . severely undermin[e] the administrative process").

In any event, Plaintiff's counsel only mentions this argument in the Preliminary Statement of his brief but does not expand upon it in the Argument section of his brief. For these reasons, the Court declines to consider it.

## B. Errors in the Severity Determination at Step Two: Failure to Consider Medical Evidence of an Onset Date as Early as 2003 and Failure to Apply the Treating Physician Rule

After examining Plaintiff's testimony in light of the medical evidence of record, the ALJ found that her "medically determinable impairments *could not* [sic] have been reasonably expected to produce all her alleged symptoms; *however* [sic], the claimant's statements concerning the intensity, persistence and limiting

effects of these symptoms are not credible to the extent they are unsupported by the medical record, and therefore [are] inconsistent with finding that the claimant has *no [sic]* severe impairment or combination of impairments for the reasons explained below." (T.12-13; emphases supplied). As discussed further below, the ALJ made a significant error in interpreting the medical record, and this error formed the main reason for concluding that Plaintiff's subjective complaints were inconsistent with a finding of non-severity at step two.

### 1. Factual Errors in Interpreting the Record

The crux of the ALJ's decision, and the basis for rejecting the only treating physician's report (the July 2, 2010 Crohn's & Colitis Residual Functional Capacity Questionnaire completed by Dr. Steele), was a purported seven-year gap in Plaintiff's treatment notes from Dr. Steele. The ALJ pointed to a March 4, 2009 treatment note, which he identified as being written by Dr. Steele. For this reference, the ALJ cites page 10 of Exhibit 17F, which is page 368 of the administrative transcript. This is a treatment note authored by hand specialist/surgeon, Dr. Mitten. The only place Dr. Steele's name appears on the record in question is after the "cc:" on page 369, indicating that he was to receive a copy of Dr. Mitten's note–not that he had written the note.

The ALJ's finding that there was a seven-year gap in Dr. Steele's treatment of Plaintiff is inconsistent with the medical records, which indicate that Plaintiff saw her primary care

physician (either Dr. Richard or Dr. Steele) regularly from 2002
through 2005. In particular, the record indicates visits with
Dr. Richard on September 14, 2001; January 4, 2002; February 26,
2002; April 27, 2002; March 23, 2003; October 13, 2003; and
November 29, 2004; and a visit with Dr. Steele on December 14,
2005. The record does not contain treatment notes from Dr. Steele
for 2006, 2007, and 2008, although Plaintiff did contact Dr. Steele
in December 2007 (after the date last insured), to have him fill
out a form for her job.[5] This is consistent with Plaintiff's
explanation that she did not have health insurance and could not
pay for appointments with Dr. Steele, and it is also consistent
with her testimony that she kept in touch with Dr. Steele in order
to obtain her necessary prescriptions. The fact that Dr. Steele
examined her at one point, even though she did not have insurance,
lends credence to her testimony that she was able to maintain a
treating relationship with him.

The ALJ also mischaracterized aspects of Plaintiff's medical
history. In particular, he asserted that "[o]nset on or before
March 31, 2007, the date last insured, does not appear anywhere
supported in this medical record. . . ." (T.13). However, the
impairments on which Plaintiff's application is
based-osteoarthritis, CTS, and ischemic colitis-all were diagnosed
before March 31, 2007. For instance, Plaintiff was experiencing

_____

[5]

At that time, Plaintiff was employed with the Center For
Disability and provided a residence for a disabled man.

increased arthritis pain beginning in January 2002. Complaints of worsening pain appear in the treatment notes from Dr. Richard and Dr. Steele, up until the time she ceased visits with them due to her lapse in insurance. Also of note is the May 2002 referral to Dr. Vaz due to ongoing pain in her hands caused by CTS. Dr. Richard, in March 2003, indicated that Plaintiff continued to have peptic ulcer disease with dyspepsia and that her arthritis pain necessitated prescription painkillers. In addition, on October 2003, Plaintiff was hospitalized due to gastrointestinal bleeding and was diagnosed with ischemic colitis. Thus, the onset of Plaintiff's allegedly disabling impairments occurred before the date last insured.

### 2. Improper Drawing of Adverse Inference Against Plaintiff

In finding that the medical evidence of record did not support an onset-date prior to March 31, 2007, the ALJ stated, "[i]f[,] as indicated in Dr. Steele's residual functional capacity assessment dated July 2, 2010 (Ex. 24F), the claimant was seen every two to six months for five years[,] it is not apparent in his treatment records. . . ." (T.13). Although there is a gap between 2006 and 2008 in Plaintiff's attendance at office visits with Dr. Steele, this was due to her loss of insurance coverage, not because she did not require medical attention or because her symptoms ameliorated. See Plaintiff's Memorandum of Law at 6 (Dkt #7).

Dr. Steele and Dr. Anandarajah both stated that Plaintiff had lost her insurance coverage. When Plaintiff apparently regained

-24-

insurance coverage in 2009, she began seeing Dr. Steele on a regular basis again. The Court is cognizant, however, that the relevant period for purposes of this appeal is January 2002, to March 2007. The Court simply points this out because it supports Plaintiff's testimony that she would have made appointments to see Dr. Steele, had she been able to afford it.

Furthermore, a claimant should not be penalized for failing to seek medical treatment that she could not afford because she did not have insurance coverage. Given the remedial purpose of Social Security, Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990), courts generally take the view that "'[i]t flies in the face of the patent purpose of the Social Security Act to deny benefits to someone because he is too poor to obtain treatment that may help him.'" Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) (quoting Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984)); see also Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) ("To a poor person, a medicine that he cannot afford to buy does not exist"). "[I]t is as erroneous to consider the claimant's failure to seek treatment as a factor in the determination that her impairment is not severe as it would be to reach the ultimate conclusion that the claimant is not disabled because she failed to follow prescribed treatment when that failure is justified by lack of funds." Lovejoy, 790 F.2d at 1117 (citing Preston v. Heckler, 769 F.2d 988 (4th Cir. 1985)).

### 3.   Error in Applying the Treating Physician Rule

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). The ALJ cannot discount a treating physician's opinion unless it "lack[s] support or [is] internally inconsistent." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Furthermore, the ALJ may not "arbitrarily substitute his own judgment for competent medical opinion." Balasmo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (citation omitted).

Despite the fact that the disability determination is reserved for the Commissioner, the Second Circuit has held that administrative law judges are not exempt "from their obligation, under Schaal [v. Apfel, 134 F.3d 296 (2d Cir.)] and [20 C.F.R.] § 404.1527(d)(2), to explain why a treating physician's opinions are not being credited." Snell, 177 F.3d at 134; see also 20 C.F.R. § 404.1527(d)(2) (the SSA "will always give good reasons in [its] notice of determination or decision for the weight [given to the claimant's] treating source's opinion"). Where a treating physician's opinion on the nature and severity of a claimant's disability is not afforded "controlling" weight, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." Burgess, 537 F.3d at 129 (quoting Halloran, 362 F.3d at 33) (internal quotation marks omitted). See 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d) (2)-(6).

There is no doubt that Dr. Steele, who has been Plaintiff's primary care doctor since 2005, qualifies as a treating physician. See Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989) ("Whether the 'treating physician' rule is appropriately applied depends on 'the nature of the ongoing physician-treatment relationship.") (quoting Schisler v. Heckler, 851 F.2d 43, 45 (2d Cir. 1988)). As discussed above, the ALJ determined that Dr. Steele had stated, in a note dated March 4, 2009, that Plaintiff returned after not having been seen for seven years. (T.13) (citing Ex. 17F, p. 10, i.e., T.368). The note in question, however, was authored by hand surgeon Dr. Mitten, with a "cc" (carbon copy) to Dr. Steele as Plaintiff's primary care physician. (T.368). The ALJ went on to assert that "the treatment record is consistent with Dr. Steele's [sic] indication[,]" (T.13), citing notes dated May 15, 2002 (Dr. Vaz diagnosing Plaintiff with probable CTS); May 29, 2002 (electromyelography showing CTS); May 8, 2006 (a DEXA scan); and December 6, 2007 (examination by Dr. Steele in connection with her employment with the Center for Disability). If, as the decision implies, the ALJ agrees that Dr. Steele was involved in her care in May 2006, and December 2007, then there was not a gap of seven years in Dr. Steele's treatment of Plaintiff.

Although the ALJ here provided "specific" reasons for rejecting Dr. Steele's opinion, they were not "legitimate" inasmuch as they were based on a misinterpretation of the medical record. An ALJ's failure to explicitly state "good reasons" for declining to

adopt a treating source's opinion, even on issues that are determined by the Commissioner, is a ground for remand. Snell, 177 F.3d at 133–34 (remanding for a statement of the reasons why a treating source's finding of disability was rejected by the ALJ).

## C. Failure to Consider Whether a Period of Disability Arose at a Time that Predated the Date Last Insured But During a Time When Plaintiff Was of "Advanced Age"

Plaintiff argues that the ALJ erred in failing to consider an onset date of Plaintiff's birthday in 2005, which "could plausibly be an amended onset date since she would have then been characterized at [sic] advanced age." (T.512). Plaintiff provided little argument to support this contention, commenting that Plaintiff's ischemic colitis, "superimposed over . . . [her] other limitations including her osteoarthritis, inflammatory arthritis, and depression would have placed her at a sedentary RFC as of 2003 or at least in the 'light' category as of her 55th birthday [in 2005] making her entitled to a favorable decision with either of these proposed amended onset dates." (T.512). Plaintiff provides no further explanation as to how a "sedentary" or "light" RFC would amount to a determination of disability. The Court is not persuaded that this argument has merit.

## D. Failure to Make an RFC Assessment

Plaintiff asserts that the ALJ failed to make factual findings in connection with assessing Plaintiff's RFC. The RFC determination is made at the fifth step of the sequential evaluation. See 20 C.F.R. § 404.1520(a) ("At the fifth and last step, we consider our

assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work."). The SSA's model for determining disability is "sequential" in the sense that when a decision can be made at an earlier step, later steps are not considered. See 20 C.F.R. §§ 404.1520(a), 416.920. Thus, because the ALJ terminated his analysis at step two (albeit based upon erroneous fact-finding), he was not required to proceed any further in the sequential evaluation.

**IX.  Remedy**

A reviewing court has the authority to reverse with or without remand. 42 U.S.C. §§ 405(g), 1383(c)(3) (2003). As discussed above, the ALJ made significant errors of fact and misapplied the law at step two, finding that Plaintiff's medically determinable impairments were not "severe", when considered singly or in combination. Where the ALJ has made errors at step two, courts in this Circuit have generally remanded for a renewed severity determination. E.g., Spears v. Heckler, 625 F. Supp. 208, 212-13 (S.D.N.Y. 1985); see also Taylor v. Astrue, No. 6:11-cv-588(GLS), 2012 WL 1415410, at *2 (N.D.N.Y. Apr. 24, 2012). Here, however, if the ALJ had properly applied the treating physician rule and had not misstated the record, a severity finding in Plaintiff's favor was required.

As an initial matter, the Court notes that the Second Circuit has strongly cautioned that the severity standard at step two is to

be applied "solely to screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (citation omitted). In addition, if a claimant has multiple impairments, as does Plaintiff, these impairments must be considered in combination. 20 C.F.R. § 404.1523 ("In determining whether [a claimant's] physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law," the Commissioner must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."); see also, e.g., Dixon, 54 F.3d at 1031 (citing DeLeon v. Secretary of HHS, 734 F.2d 930, 937 (2d Cir. 1984); Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir. 1975); other citations omitted)). As Dr. Anandarajah noted, over the past 20 years, Plaintiff had seen multiple physicians and surgeons, for her pain in the small joints of her hands and in her back. Despite trying various treatment modalities and medications and undergoing two surgeries, she still had significant pain and limitations in her daily activities due to her arthritis and CTS. In addition, the unpredictability of her bouts of ischemic colitis made it difficult for her to complete daily activities without interruption. Thus, there is clearly substantial evidence in the record to support a finding that Plaintiff's combined impairments of chronic arthritis pain, CTS (which has required two surgeries to date), and ischemic colitis significantly limit her ability to

engage in "the abilities and activities[6] necessary to do most jobs." 20 C.F.R. § 404.1521(b).

Furthermore, substantial evidence exists in the record to warrant giving deference to the opinion of Plaintiff's treating physician and compels a finding of disability. See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) ("[T]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant.") (internal quotation marks omitted). As discussed above, Dr. Steele undoubtedly qualifies as a treating physician, given his ability to provide a "detailed, longitudinal picture," 20 C.F.R. § 404.1527(c)(2), of Plaintiff's impairments and resultant limitations. The fact that Dr. Steele rendered his functional capacity report in 2009, after the end of the relevant period for Plaintiff's disability application, does not undermine its significance as a treating source opinion. "Even if rendered retrospectively, an uncontradicted opinion by the treating physician is binding where it is the only medical evidence as to disability in the record." Malave v. Sullivan, 777 F. Supp. 247,

---

[6]
    Basic work activities that are relevant for evaluating the severity of an impairment include: (1) physical activities such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) the capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

252 (S.D.N.Y. 1991) (citing <u>Rivera v. Sullivan</u>, 923 F.2d 964, 968
(2d Cir. 1991) ("[C]laimants have won reversal of adverse decisions
by the Secretary even where their condition is degenerative, making
retrospective evaluation of their ability to work somewhat
speculative, and even where some non-physician testimony or
evidence suggests a possible ability to work at the relevant
time.") (citation omitted); <u>Dousewicz v. Harris</u>, 646 F.2d 771,
774-75 (2d Cir. 1981) ("[A] diagnosis of a claimant's condition may
properly be made even several years after the actual onset of the
impairment.") (quotation omitted; alteration in original)). As the
Second Circuit has observed, "the fact that a condition is more
disabling today than it was yesterday does not mean that the
condition was not disabling yesterday." <u>Dousewicz</u>, 646 F.2d at 775

Here, Dr. Steele's residual functional capacity report, which
is recounted in detail above in this Decision and Order, was the
only medical evidence in the record regarding disability. No
consultative examination of Plaintiff was performed. Where a
treating physician's retrospective opinion is the only medical
evidence in the record regarding disability, "a circumstantial
critique by non-physicians, however thorough or responsible, must
be overwhelmingly compelling in order to overcome a medical
opinion." <u>Wagner v. Secretary of HHS</u>, 906 F.2d 856, 862 (2d Cir.
1990). As discussed above, the ALJ misapprehended the pertinent
facts, and his conclusion that Dr. Steele's opinion did not warrant
controlling weight is not supported by "overwhelmingly compelling"

<u>Wagner</u>, 906 F.2d at 862, reasoning or analysis.  See <u>Malave</u>, 777 F. Supp. at 253 ("It is clear from the rest of the ALJ's opinion that he misunderstood the 'facts known here,' since, as noted above, the ALJ mistakenly stated that the 'claimant did not have a condition likely to cause pain (at least there was no evidence of it).' Thus the ALJ's conclusion that the treating physician's opinion was 'logically improbable' is not backed by 'overwhelmingly compelling' reasoning[.]"). Accordingly, the ALJ cannot provide on the present record a sufficient basis to overcome Dr. Steele's opinion, as treating physician, that Plaintiff is disabled. See <u>Malave</u>, 777 F. Supp. at 253.

## X. Conclusion

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings (Dkt #6) is denied, and the matter is reversed and remanded to the Commissioner for calculation and payment of benefits for the relevant period (January 1, 2002, to March 31, 2007). The Clerk of the Court is requested to close this case.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     May 17, 2013
           Rochester, New York